UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DISCOUNT PRINTED PROMOS USA, LLC, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHANIE WURSTER, and | ) | |
| | ) | |
| SUNFIRE SOLUTIONS LLC | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff Discount Printed Promos USA, LLC ("Plaintiff" or "DPP"), for its Complaint against Defendants Stephanie Wurster ("Wurster") and Sunfire Solutions LLC ("Sunfire"), alleges as follows:

## **Introduction**

1.     This action arises out of Defendants' blatant violations of contractual, statutory, and common law obligations to DPP.

2.     Wurster began working for DPP in March 2014 as an Account Manager. Before then, Wurster had no experience in the promotions business.

3.     During her more than eight years at DPP, Wurster was entrusted with confidential and valuable information that was integral to DPP's competitive advantage in the marketplace of promotional products, including but not limited to DPP's customer lists, account histories, and pricing strategies.

4.      DPP took multiple steps to protect its confidential information, such as: keeping electronically stored information "locked" in password-protected systems including DPP's private network; requiring employees to enter company-provided credentials to access any DPP computer-based system; refraining from disclosing confidential information beyond those on a "need to know" basis; and requiring that employees abide by confidentiality policies.

5.      In March 2018, Wurster was given the opportunity to cease working as an employee and become an owner in DPP and take on responsibilities as one of DPP's Members and Managers —demonstrating the significant level of trust placed in her by DPP and its other Manager and Member, Hillary Teague ("Teague").

6.      In addition, to become a Member and Manager of DPP, Wurster signed the Operating Agreement of Discount Printed Promos USA LLC ("DPP Operating Agreement," attached hereto as Exhibit A), which included multiple provisions intended to protect DPP's confidential information, its goodwill, and its hard won place in the promotional products business, including but not limited to promises not to compete with DPP or solicit its customers for a period of two years after the end of her membership in DPP, and not to misuse its confidential information.

7.      Wurster broke those promises.

8.      On or around July 15, 2022, Wurster ended her Membership of DPP and gave notice she would remain with DPP as an employee only until on or around August 4, 2022.  Almost immediately after she then ended her employment with DPP, Wurster formally established Defendant Sunfire. Like DPP, Sunfire is in the business of promotional products.

9.     Moreover, and as discussed further below, after Wurster announced her resignation from DPP, but *before* she stopped working at DPP, Wurster forwarded *to her personal email address* multiple documents and other information comprising DPP confidential information for no conceivably legitimate business justification and with the apparent intent to use it to establish a business in direct competition with DPP.

10.     Wurster and Sunfire have undoubtedly used such information—and other confidential information learned by Wurster during her time at DPP—to unfairly compete with DPP. Indeed, DPP has learned that at least one of its major customers has been placing orders with Sunfire for the very same products it had previously ordered from DPP.

11.     DPP brings this action to stop Defendants' illicit conduct, recover for the damages inflicted by Defendants, and prevent further ongoing harm to DPP.

## Parties

12.     Plaintiff DPP is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 320 North River Street, East Dundee, IL 60118. Its sole member is Teague.

13.     Defendant Wurster is an individual who resides in (and on information and belief is a citizen of) Illinois and is domiciled within the Northern District of Illinois. From March 2014 until on or around August 4, 2022, Wurster worked for DPP as an Account Manager.

14.     From on or around March 30, 2018 until on or around July 15, 2022, Wurster was an owner in DPP, a Manager of the limited liability company, and also a Member of DPP.

15.     Defendant Sunfire is a limited liability company organized and existing under the laws of the State of Illinois with a principal place of business at 1420 Clayton Marsh Drive, Lake in the Hills IL 60156.

## Jurisdiction and Venue

16.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 because this Court has original jurisdiction over DPP's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*. In addition, this Court has supplemental jurisdiction over DPP's state law causes of action pursuant to 28 U.S.C. § 1367(a).

17.     The exercise of personal jurisdiction over Wurster in this Court is proper and comports with Illinois law and with the constitutional requirements of due process because Wurster is a citizen of Illinois and is domiciled in the Northern District of Illinois, and because she committed tortious acts within Illinois. Further, the DPP Operating Agreement provides that "[a]ny actions or proceedings . . . seeking to enforce . . . any provision of [the DPP Operating Agreement] shall be brought, tried and litigated against any of the parties in the state and federal courts sitting in Chicago, Illinois and each of the parties hereby consents to the jurisdiction of such courts[.]" (Ex. A at Section 13.9.)

18.     The exercise of personal jurisdiction over Sunfire in this Court is proper and comports with Illinois law and with the constitutional requirements of due process because Sunfire's principal place of business is located in the State of Illinois, it regularly transacts business in Illinois, and it committed tortious acts in Illinois.

19. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) because Wurster and Sunfire reside in this District and Division. Further, pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to the claims asserted herein occurred in this District and Division. Finally, pursuant to the DPP Operating Agreement, Wurster has waived "any and all possible objections to venue laid" in this Court. (Ex. A at Section 13.9.)

## Factual Background

### I.    Background of DPP

20. DPP is in the business of promotional products. Its creative team has decades of experience in helping its customers find custom promotional items to promote their brands, impress their target audiences, and leave a lasting impression. DPP prides itself on its creativity, customer service, and commitment to maintaining ongoing relationships with its clients.

21. The products offered by DPP include branded items used for employee recognition and incentives, apparel, sales and marketing kits, and other promotional items ranging from golf balls and baseball caps to high-end drinkware, hard-sided coolers, bags, masks, writing instruments and office supplies, and technology products such as USB drives, power banks, Bluetooth items and speakers.

22. DPP's customers are located throughout the country and internationally. It ships its promotional products to multiple states and countries. Its products are used in interstate commerce.

23. DPP distinguishes itself from other companies in the competitive promotional products marketplace by going beyond merely being a drop-ship

distributor of branded products manufactured by other vendors. DPP stands out from its competition by developing multiple unique products such as by using its customers' logos and branding, and by offering its customers a suite of services beyond promotional products—*e.g.,* company stores, kitting and fulfillment services, and retail products with customer logos and branding.

24. DPP spends considerable resources and time developing the long-standing relationships with its customers that it has maintained. Those relationships allow DPP to learn each customer's specific ordering requirements and preferences—*e.g.,* product and artwork preferences, quantities, budgets and other pricing requirements, and available time for ordering.

25. DPP also devotes significant resources to developing unique products for a customer by selecting products that might appeal to that customer, developing artwork for use on those products, and pitching and providing samples of those products. Engaging in that creative process for its customers allows DPP to understand a customer's preferences with respect to the artwork and the products it will order from DPP.

26. That information is fundamentally important to DPP's ability to compete in the promotional products business because it allows DPP to predict and fulfill its customers' orders in a timely, efficient, and economical manner. DPP's knowledge of its customers' needs and preferences allows it to maintain the long-standing, near-permanent relationships that drive its ability to generate revenue.

27.     For example, DPP successfully developed such a relationship with the company Vetoquinol, which, prior to events described below, had been a DPP client since 2016.

28.     DPP spent years developing a relationship with Vetoquinol, learning its preferences and order requirements, and creating unique products that Vetoquinol ordered from DPP. Because DPP understood Vetoquinol's preferences and order requirements, and offered Vetoquinol unique products developed over time during the relationship, Vetoquinol consistently ordered promotional products from DPP. DPP worked with vendors to supply these products, based on pricing strategies that DPP developed over time to ensure its profitability.

## II.     DPP's Trade Secrets and Policies and Procedures for Safeguarding This Information

29.     The information described above — information about customer ordering preferences, order requirements, pricing, and the unique products developed by DPP – are legally-protected trade secrets. That information has independent economic value from not being generally known because it allows DPP to predict and fulfill its customers' orders in a timely, efficient, and economical manner superior to the delivery of promotional products from a company that lacks that inside information about a customer.

30.     Further, DPP's customers order from DPP in order to obtain the unique products that DPP has developed for them. Information that goes into providing those unique products has independent economic value from not being generally known

because DPP's customers can obtain those unique products only from DPP and, thus, order them from DPP as opposed to other promotional product companies.

31.    DPP takes reasonable measures to keep the information described above secret. Information about a customer's ordering preferences and requirements, artwork, and the unique products that it orders from DPP is kept on a private network that is accessible only by individuals with credentials that allow them to access the network. When an employee leaves DPP, that access is terminated. Only employees of DPP are permitted to access the private network.

32.    In addition, DPP prohibits employees from disclosing confidential information and requires employees to abide by confidentiality policies.

33.    For example, DPP's Employee Handbook includes a confidentiality provision, which prohibits its employees from "disclos[ing] to any unauthorized person any knowledge or information relating" to DPP's business without written permission. The Employee Handbook identifies "information regarding company business strategy"; "customer lists"; "pricing information"; and "promotional and marketing literature" as examples of confidential information covered by this policy. Violating the confidentiality provision is a basis for discipline, up to and including termination of employment, and could expose the offending employee to legal action.

### III.    Defendant Wurster's Employment with DPP, Membership in DPP, and Contractual Obligations

34.    On or around March 18, 2014, Wurster began working for DPP as an Account Manager under the direction of Teague. In that capacity, Wurster was tasked

with developing business and managing certain accounts, including, for example, Vetoquinol.

35.     Throughout her tenure with DPP, Wurster had access to DPP's proprietary information detailed above, including but not limited to DPP's customer lists, account histories, and pricing strategies. Through her more than eight years with DPP, she acquired an extensive understanding of DPP's business and the information that enables DPP to compete with other businesses in the competitive promotional products marketplace.

36.     On or around March 30, 2018, Wurster became a Member of DPP and executed the DPP Operating Agreement. (*See* Ex. A at Signature Page.)

37.     The DPP Operating Agreement includes multiple restrictive covenants intended to protect DPP's ability to compete in the promotional products marketplace.

38.     Pursuant to Section 12.1 of the DPP Operating Agreement, Wurster promised not to compete with DPP while she was a Member of DPP and for a period of 24 months thereafter:

> Section 12.1 Non-Compete. Each Member agrees that for the period during which they are a Member, and for twenty-four (24) months thereafter (the "Restricted Period"), neither such Members nor its Affiliates shall own or engage in the business of, either directly or indirectly, as an officer, manager, employee, independent contractor, consultant, investor, director, partner, member, sole proprietor or stockholder, any promotions company performing work similar to that of [DPP] in or within 50-miles of Chicago, Illinois (the "Competitive Activities").

(Ex. A at Section 12.1.)

39.     Section 12.2 of the DPP Operating Agreement prohibits Wurster from soliciting DPP's customers during the "Restricted Period":

> Section 12.2 Non-Solicitation. During the Restricted Period, neither a Member nor its Affiliates shall, directly or indirectly, individually or on behalf of any person, without the prior written consent of the Manager . . . aid or induce any current, previous or prospective vendor, client, purchaser, lender, supplier or sales representative not to establish a relationship with [DPP] or its Affiliates or to discontinue such relationship or reduce the amount of business done with DPP or its Affiliates.

(Ex. A at Section 12.2.)

40.    In Section 12.3 of the DPP Operating Agreement, Wurster acknowledged that she was privy to DPP's confidential information and promised to protect that information from improper disclosure or use:

> Section 12.3 Confidential Information. Each Member acknowledges and agrees that it is and will be in possession of Confidential Information (as defined herein) relating to [DPP]. For purposes hereof, "Confidential Information" shall mean all proprietary or confidential information concerning the business, properties and operations of [DPP], as conducted by DPP or its Affiliates, or successors or assigns at any time during the period when the Member is a Member, including, without limitation, all customer and suppliers lists, mailing lists, know-how, trade secrets, business and marketing plans, techniques, forecasts, projections, budgets, unpublished financial statements, price lists, costs, data and other original works of authorship, along with all information received from third parties or held in confidence in connection with [DPP]. Each Member will and will cause his or her Affiliates to hold the Confidential Information in the strictest confidence and will not disclose to any person or make use of (directly or indirectly) the Confidential Information or any portion thereof on behalf of themselves or any third party, except as required. by the order of any court or similar tribunal or any other governmental body or agency of appropriate jurisdiction; provided, that such Member shall, to the extent practicable, give [DPP] prior notice of any such disclosure and shall cooperate with [DPP] in obtaining a protective order or such similar protection as [DPP] may deem appropriate to preserve the confidential nature of such information. The foregoing obligations to maintain the Confidential Information shall not apply to any information

> which (a) is or, without any action by such Member, becomes
> generally available to the public or (b) was known by such
> Member on a non-confidential basis prior to its disclosure by
> [DPP].

(Ex. A at Section12.3.)

41.     Section 12.6 of the DPP Operating Agreement acknowledges that breach of

these restrictive covenants would cause DPP irreparable injury and authorizes DPP to

seek remedy for those breaches:

> Section 12.6 Remedies. The Members recognize that [DPP]
> will suffer irreparable injury in the event of a breach of
> Sections 12.1, 12.3 [or] 12.3 . . . by any Member or Manager. In
> the event of a breach of Sections 12.1, 12.3 [or] 12.3 . . . [DPP]
> and the non-breaching Members shall be entitled, in addition
> to any other remedies and damages available and without
> proof of monetary or immediate damages, to a temporary
> and/or permanent injunction, without the necessity of
> posting a bond, to restrain the violations of Sections 12.1, 12.3
> [or] 12.3 . . . by the breaching Member or Manager, and any
> persons acting for or in concert with the breaching Member or
> Manager.

(Ex. A at Section 12.6.)

42.     Wurster ended her Membership of DPP on or around July 15, 2022.

43.     On the same day, Wurster announced that she was resigning from DPP,

with the plan to remain an employee at DPP through August 4, 2022.

44.     Wurster ended her employment with DPP on August 4, 2022.

## IV.     Defendants Wurster and Sunfire's Unlawful Acts

45.     When Wurster informed Teague of her resignation, she assured Teague

that she did not intend to remain in the promotional products business.

46.     However, even before she left DPP, Teague began a course of conduct

designed to unlawfully compete with DPP.

47.     After Wurster announced her resignation, and while she remained employed with DPP and was entrusted with training her successors at DPP, she improperly accessed and forwarded to her personal email address confidential information of DPP.

48.     More specifically, based on investigation to date, DPP has discovered that Wurster emailed to other DPP personnel multiple files and documents, but when she did so, **she also included her personal email address as a "blind carbon copy" or "bcc,"** obviously intending to hide from those who received these emails that she also was secretly sending this information to herself.

49.     Certain examples, uncovered so far, of Wurster's duplicitous scheme to email her then-coworkers, but hide the email to her personal email address by including it as a bcc, include the following:

        a)  On July 21, 2022, Wurster sent an email that included her personal email address as a bcc, attaching a "screenshot" of a DPP decal that had artwork and design DPP created from scratch for one of its customers.

        b)  On July 25, 2022, Wurster sent an email that included her personal email address as a bcc, attaching a file titled "Running your billed report for commissions.pdf" that contains information about multiple clients, their order history, pricing, and margins on these orders, including for one of DPP's biggest customers (Emerson Professional Tools). Another file attached to that email was titled "Full Emerson Training," which contains confidential information about billing procedures, company store procedures, and restocking and billing practices prepared exclusively for Emerson

Professional Tools—information that DPP has developed during its years-long relationship with this customer.

c)  On July 26, 2022, Wurster sent an email that included her personal email address as a bcc, attaching multiple documents including a file titled "Kim's Account with notes.pdf" and a file titled "Sam's Accounts with notes.pdf" that contain a list of clients, their sales history for the past four years, and information about these clients such as the key contacts, their order preferences, and previous communications with them.

d)  On July 27, 2022, Wurster sent an email that included her personal email address as a bcc, attaching a Microsoft Excel file titled "Handing over to Kim.xls" that contains a list of almost 100 client and contacts including names and email addresses.

e)  On July 27, 2022, Wurster sent an email that included her personal email address as a bcc, attaching a Microsoft Excel file titled "Report Of QB and CS Compairison [sic]" that contains internal billing and accounting processes for DPP.

50.  On July 28, 2022, Wurster sent an email that included her personal email address as a bcc, attaching an electronic file titled "Copy of Altec Promo Funds.PNG." This file contains information about the funds that individual employees at Emerson Professional Tools are permitted to purchase from its employee store, which DPP created and operated expressly for Emerson Professional Tools.

51.  To try to further cover her tracks, Wurster then deleted these emails, which DPP only recently recovered upon investigating this matter.

52.  Thereafter, on or around August 17, 2022—less than two weeks after she stopped working at DPP—Wurster formally established Sunfire, which is located at 1420

Clayton Marsh Drive, Lake in the Hills, Illinois, 60156, which is within 50 miles of Chicago, Illinois.

53.     There can be no legitimate dispute that Sunfire is in direct competition with DPP. According to its website, sunfiresolutionsllc.com, Sunfire is "a full service advertising specialties company offering a wide range of promotional items" that aims to "find a cost-effective way to market and promote your business with custom promotional items that speak to your customers and clients," with "possibilities" that "are only limited by your imagination." (www.sunfiresolutionsllc.com)

54.     According to its website, Sunfire offers many of the same promotional products as DPP, including awards, apparel, bags, drinkware, baseball caps, golf balls, masks, writing instruments and office supplies, and technology products such as USB drives, power banks, Bluetooth items and speakers.

55.     There can be no doubt that Sunfire has been providing Vetoquinol with promotional products—indeed, the very same products that Vetoquinol used to order from DPP. In fact, a Vetoquinol employee recently attempted to send an email to Wurster, apparently inadvertently to Wurster's previous *DPP email address*, about ordering products from Wurster and Sunfire. The referenced order was identical to orders that Vetoquinol had previously placed with DPP. In fact, the order used artwork that DPP had developed for Vetoquinol during its years-long relationship with DPP. Further investigation uncovered that Sunfire ordered the products for Vetoquinol from one of DPP's vendors.

56.     Since Wurster departed DPP and established Sunfire, DPP's business with Vetoquinol has significantly diminished. Prior to Wurster's departure from DPP, Vetoquinol was one of DPP's most substantial customers.

57.     Based on Vetoquinol's history with DPP, Defendants likely have deprived DPP of hundreds of thousands of dollars *already* in foregone sales from Vetoquinol, with the potential for even more (likely substantially more) if Defendants' unlawful activity continues.

58.     On information and belief, Wurster is contacting and/or conducting business with other long-standing DPP customers.  The fact that Wurster sent DPP customer information secretly to herself weeks before forming Sunfire – and that, even without the benefit of formal discovery, DPP already has discovered impermissible competitive activity – make it almost certain that Wurster is causing and will continue to cause ongoing harm to DPP's long-standing, near-permanent customer relationships (including at least one that has a contract that is imminently up for renewal).

59.     The foregoing conduct, including Wurster's establishment of Sunfire and work on its behalf, use of DPP's confidential information, and solicitation of DPP's customers, violate the restrictive covenants in the DPP Operating Agreement and give rise to multiple other causes of action.

60.     Before filing this lawsuit, DPP via counsel contacted Wurster, who has refused to cease her unlawful conduct.

### Count I
### Breach of Contract (Against Wurster)

61.     DPP incorporates the foregoing paragraphs as if fully stated herein.

62.     Wurster entered into the DPP Operating Agreement, which is a valid and enforceable contract.

63.     As set forth more fully above, the DPP Operating Agreement includes multiple restrictive covenants, including a restriction on competitive activities and on solicitation of clients, purchasers, vendors, and other entities, both during and for two years after Wurster was a Member of DPP.  The DPP Operating Agreement also required that Wurster abide, and continue to abide, by confidentiality obligations including the prohibition on the disclosure of proprietary or confidential DPP information.

64.     As described above, Wurster has breached the DPP Operating Agreement in multiple manners, including without limitation by: (a) accessing and forwarding DPP's confidential information to her personal email address, for her own personal interest; (b) forming and operating Sunfire in competition with DPP in the promotional products marketplace; (c) improperly retaining, using and disclosing DPP's confidential information during and subsequent to her employment with DPP; and (d) soliciting, and attempt to solicit, business away from DPP.

65.     As a direct and proximate result of Wurster's breaches of the DPP Operating Agreement, DPP has incurred and will continue to incur damages including, but not limited to, lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial. DPP has also suffered and will continue to suffer immediate and irreparable harm as a result of such breaches. If Wurster is not enjoined, DPP will continue to suffer injury until the breaches are enjoined. Because DPP is without an adequate remedy at law, preliminary and permanent injunctive relief also is necessary to prevent this continuing harm to DPP.

## Count II
## Violation of Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.* (Against Wurster and Sunfire)

66.     DPP incorporates the foregoing paragraphs as if fully stated herein.

67.     Defendants' actions constitute violations of one or more provisions of the Defend Trade Secrets Act ("DTSA").

68.     The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

69.     The DTSA further provides that "a court may. . . grant an injunction – to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable . . . ." 18 U.S.C. § 1836(b)(3)(A)(1).

70.     By engaging in the conduct described above, Defendants have misappropriated, threaten to misappropriate, or inevitably will misappropriate DPP's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

71.     The trade secret information to which Wurster had access and which came into her possession includes specific customer ordering preferences, order requirements, and information about the unique products developed by DPP that DPP expended time, energy, money and ingenuity in compiling, based on its own efforts and communications with clients, prospective clients, and others.

72.     DPP has taken reasonable measures to keep this information secret by, among other methods discussed more fully above, maintaining it on a private network accessible only by those with valid DPP credentials and by imposing confidentiality

17

obligations on its employees that are intended to prevent the unauthorized use or disclosure of that information.

73. These trade secrets are related to DPP's products and services, which DPP uses in interstate commerce by shipping its products to customers in multiple states and foreign countries.

74. The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information by using such information to poach DPP's clients.

75. DPP communicated these trade secrets to Wurster in confidence.

76. Wurster owed and continues to owe fiduciary and contractual duties to DPP to maintain the secrecy of the trade secrets and limit the use of the trade secrets. Wurster acquired the trade secrets by improper means.

77. On information and belief, Wurster intended to convert or inevitably will convert the trade secrets to the economic benefit of herself and Sunfire, without DPP's consent, for use while at Sunfire, to poach clients or prospective clients of DPP, for Wurster's and Sunfire's economic benefit.

78. DPP's trade secrets were not generally known to, and are not readily ascertainable through proper means by, Sunfire.

79. Defendants can obtain economic value from the disclosure and use of DPP's trade secrets, for example by utilizing the information therein to solicit, attempt to induce, and induce DPP's clients to switch their business from DPP to Sunfire, and derive personal financial gain from such activities.

80.     On information and belief, Sunfire acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without DPP's authorization and in violation of Wurster's contractual commitments and other legal duties to DPP.

81.     As a direct and proximate result of Defendants' conduct, DPP has suffered and will continue to suffer irreparable harm, injury and loss. Furthermore, pursuant to the DTSA, actual or threatened misappropriation can be enjoined. If not enjoined, DPP will continue to suffer irreparable harm that cannot be remedied through money damages.

82.     As a direct and proximate result of the conduct of Defendants, DPP also is entitled to damages in an amount to be determined at trial.

83.     In addition, Defendants' conduct has been willful and malicious, entitling DPP to punitive and other damages and relief.

## Count III
## Violation of Illinois Trade Secrets, 765 ILCS/1 *et seq*. (Against Wurster and Sunfire)

84.     DPP incorporates the foregoing paragraphs as if fully stated herein.

85.     By engaging in the conduct described above, Defendants have misappropriated, threaten to misappropriate, or inevitably will misappropriate DPP's trade secrets.

86.     Wurster owed and continues to owe fiduciary and contractual duties to DPP to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

87.     Wurster obtained DPP's trade secrets under circumstances giving rise to fiduciary and contractual duties owed by Wurster to DPP.

88.     Wurster has misappropriated DPP's trade secrets in violation of those fiduciary and contractual duties.

89.     The trade secret information to which Wurster had access and which came into her possession includes specific customer ordering preferences, order requirements, and information about the unique products developed by DPP that DPP expended time, energy, money and ingenuity in compiling, based on its own efforts and communications with clients, prospective clients, and others.

90.     DPP has taken reasonable measures to keep this information secret by, among other methods discussed more fully above, maintaining it on a private network accessible only by those with valid DPP credentials and by imposing confidentiality obligations on its employees that are intended to prevent the unauthorized use or disclosure of that information.

91.     DPP's trade secret information is sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use.

92.     On information and belief, Wurster intended to convert or inevitably will convert the trade secrets to the economic benefit of herself and Sunfire, without DPP's consent, for use while at Sunfire, to poach clients or prospective clients of DPP, for Wurster's and Sunfire's economic benefit.

93.     DPP's trade secrets were not generally known to, and are not readily ascertainable through proper means by, Sunfire.

94.     Defendants can obtain economic value from the disclosure and use of DPP's trade secrets, for example by utilizing the information therein to solicit, attempt

to induce, and induce DPP's clients to switch their business from DPP to Sunfire, and derive personal financial gain from such activities.

95.     On information and belief, Sunfire acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without DPP's authorization and in violation of Wurster's contractual commitments and other legal duties to DPP.

96.     As a direct and proximate result of Defendants' misappropriation of trade secrets, DPP has suffered and will continue to suffer immediate irreparable harm, injury, and loss. Pursuant to the Illinois Trade Secret Act, actual or threatened misappropriation may be enjoined. Unless enjoined by this Court, Defendants will continue to use DPP's trade secret information to unfairly compete and enjoy commercial advantage that they would not have but for their misappropriation.

97.     The acts and conduct of Defendants were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

98.     As a direct and proximate result of the conduct of Defendants, DPP also is entitled to damages in an amount to be determined at trial.

**Count IV**
**Breach of Duty of Loyalty (Against Wurster)**

99.     DPP incorporates the foregoing paragraphs as if fully stated herein.

100.    While she was an employee of DPP, Wurster owed DPP a duty of loyalty to act at all times in utmost good faith and in DPP's best interest.

101.    As described more fully above, Wurster violated those duties by acting contrary to DPP's best interests by, for example: (a) misrepresenting to DPP and Teague that she did not plan to depart DPP and compete with it in the promotional products

marketplace; (b) while she ostensibly trained her successors, using that time to covertly begin laying the groundwork for a competitive enterprise; (c) misappropriating DPP's information in order to enable her to compete with DPP; and (d) interfering with DPP's business opportunities and luring DPP clients away from doing business with DPP.

102.    As a direct and proximate result of Wurster's conduct, DPP has sustained and will incur damages including, but not limited to, lost business, lost profits, damages to its goodwill, and the salary and compensation paid to Wurster during the period of her breaches, in amount to be proven at trial. DPP has also suffered and will continue to suffer immediate and irreparable harm as a result of such breaches. If Wurster is not enjoined, DPP will continue to suffer injury until the breaches are enjoined. Because DPP is without an adequate remedy at law, preliminary and permanent injunctive relief also is necessary to prevent this continuing harm to DPP.

### Count V
### Tortious Interference with Contract (Against Sunfire Solutions)

103.    DPP incorporates the foregoing paragraphs as if fully stated herein.

104.    The DPP Operating Agreement is a valid and enforceable agreement between DPP and Wurster.

105.    At all times, Sunfire was aware of this valid and enforceable contract.

106.    Sunfire's conduct has caused Wurster multiple breaches of the DPP Operating Agreement.

107.    As set forth more fully above, Sunfire intentionally and unjustifiably has induced Wurster to breach the DPP Operating Agreement including by, at least, retaining, using and disclosing DPP's confidential information subsequent to Wurster's

resignation from DPP, and soliciting, and attempting to solicit, business away from DPP.

108.    As a direct and proximate result of Sunfire's conduct, DPP has sustained and will incur damages including, but not limited to, lost business, lost profits, and damages to its goodwill, in amount to be proven at trial. DPP has also suffered and will continue to suffer immediate and irreparable harm as a result of such breaches. If Sunfire is not enjoined, DPP will continue to suffer injury until the breaches are enjoined. Because DPP is without an adequate remedy at law, preliminary and permanent injunctive relief also is necessary to prevent this continuing harm to DPP.

**Count VI**
**Tortious Interference with Prospective Economic Advantage (Against Wurster and Sunfire)**

109.    DPP incorporates the foregoing paragraphs as if fully stated herein.

110.    DPP has strong, long-term relationships with customers and clients such as, for example, Vetoquinol.

111.    DPP had and has a reasonable expectation that its business relationship with its clients and customers would continue, and that DPP would continue to service these entities.

112.    Defendants have knowledge of DPP's expected continued relationships.

113.    By the conduct described above, Defendants intentionally, improperly, maliciously, and without any justification interfered with DPP's prospective economic advantage by soliciting and inducing customers to move some or all of their business from DPP to Sunfire, including by using DPP's confidential information that Wurster and Sunfire unlawfully retained and disclosed.

114.    But for Defendants' unlawful conduct, it is reasonably probable that DPP would have continued its economically advantageous relationship with such customers.

115.    As a direct and proximate result of Defendants' conduct, DPP has suffered damages in an amount to be specifically determined at trial. DPP has also suffered and will continue to suffer immediate and irreparable harm as a result of Defendants' conduct. If Defendants are not enjoined, DPP will continue to suffer irreparable harm. Because DPP is without an adequate remedy at law, preliminary and permanent injunctive relief also is necessary to prevent this continuing harm to DPP.

### Prayer for Relief

WHEREFORE, DPP respectfully requests that the Court grant the following relief in favor of DPP and against Defendants (without waiving or limiting any other relief that may be available to DPP):

I.      Enter judgment in favor of DPP and against Defendants on all counts;

II.     Enter an order preliminarily and permanently enjoining Wurster, for a period of two years from entry of judgment, from doing any of the following either directly or indirectly through her associates, agents, employees, or companies:

> a. owning or engaging in the business of, either directly or indirectly, as an officer, manager, employee, independent contractor, consultant, investor, director, partner, member, sole proprietor or stockholder, any promotions company performing work similar to that of DPP in or within 50-miles of Chicago, Illinois, including without limitation Sunfire Solutions LLC;
>
> b. directly or indirectly, individually or on behalf of any person, aiding or inducing any current, previous or prospective vendor, client, purchaser, lender, supplier or sales representative not to establish a relationship with DPP or its Affiliates (as that term is defined under the DPP Operating Agreement) or to discontinue such relationship or reduce the amount of business done with DPP or its Affiliates; and

    c. using, disclosing, communicating, divulging, copying, or misusing or abusing any confidential information of DPP.

III.    Enter an order preliminarily and permanently enjoining Sunfire, for a period of two years from entry of judgment, from assisting, encouraging, enabling, participating in, inducing, aiding, or abetting the acts described in section (II) above;

IV.    Order Defendants to immediately return to DPP any and all confidential information in Defendants' possession, custody, or control and permanently uninstall and delete from each of their respective computers and other information storage media and devices, all DPP confidential information and all other property of DPP, however stored or maintained, and all paper and electronic copies thereof, including without limitation any and all information related to, evidencing, or derived in whole or in part from information about DPP's clients or customers;

V.    Order that Defendants pay to DPP an amount of damages to be specifically determined at trial;

VI.    Order that Defendants reimburse DPP for its attorneys' fees, costs, and disbursements in bringing this action;

VII.    Order that Defendants pay DPP punitive or exemplary damages as allowed by law; and

VIII.    Order such other relief as the Court may deem just and proper.

### Jury Demand

DPP hereby demands a jury trial on all issues so triable.

Dated: March 23, 2023                Respectfully submitted,

*/s/ Gregory Abrams*
Gregory Abrams
Tucker Ellis LLP
233 South Wacker Drive, Suite 6950
Chicago, Illinois 60606-9997
Tel: 312.624.6300
Fax: 312.624.6309
gregory.abrams@tuckerellis.com

*Attorney for Plaintiff Discount Printed Promos USA, LLC*

018896\000001\5931892.2